CENTRAL SAN VICENTE, INC., peticionaria, *v.* JUNTA AZUCA-
RERA DE PUERTO RICO, demandada.

Número 9.

*Sometido:* 4 de abril de 1955. *Resuelto:* 14 de noviembre de 1955.

*James R. Beverley, José López Baralt, R. Rodríguez Lebrón* y *Francisco Castro Amy,* abogados de la peticionaria; *Alejandro Romanace,* abogado de la demandada; *Antonio Riera,* abogado de la Autoridad de Tierras, interventora.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Acogiéndose a las disposiciones del art. 3 de la Ley Azucarera—Ley núm. 426 de 13 de mayo de 1951 ((1) pág. 1139)—los respectivos administradores de las Fincas de Beneficio Proporcional "Ingenio" y "San Antonio", ambas propiedad de la Autoridad de Tierras, notificaron en octubre de 1953 a las centrales afectadas y a través de la Junta Azucarera, su intención de cambiar de la Central San Vicente, Inc., a la Central Plazuela la molienda del ciento por ciento de sus cañas. A este proyectado cambio se opuso la Central San Vicente, Inc., alegando haber adquirido el derecho, mediante estipulaciones contractuales, a moler todas las cañas que se cultivaran en las mencionadas fincas. La controversia originada entre las partes afectadas fué sometida a la Junta Azucarera para su resolución a base de una estipulación de hecho y de cierta prueba documental, de todo lo cual resulta lo siguiente: En los procedimientos de sindicatura habidos en el caso de *El Pueblo* v. *Rubert Hermanos, Inc.,* Quo Warranto núm. 2, la finca "Ingenio" fué vendida a la Autoridad de Tierras en 1946 por la escritura de compraventa núm. 21 otorgada el 18 de agosto de ese año ante el notario Antonio Riera, siendo una de sus condiciones que las cañas producidas en dicha finca "serán molidas en lo sucesivo en la Central San Vicente . . . . . hasta tanto no se disponga otra cosa por la Comisión de Servicio Público de Puerto

Rico." (¹)    Y de conformidad con la Sentencia por Consentimiento dictada en el caso de *El Pueblo de Puerto Rico* v. *Carmen Centrale, Inc., et al.,* Quo Warranto núm. 15, dicha Carmen Centrale, Inc., vendió a la Autoridad de Tierras, por la escritura de compraventa núm. 14 otorgada el 6 de mayo de 1946 ante el notario Aureliano Rivas, la finca San Antonio sujeta a una condición parecida en el sentido de obligarse la Autoridad compradora a moler todas las cañas en los molinos de la Carmen Centrale, Inc., sus sucesores o cesionarios. (²)    Las ameritadas Sentencia por Consentimiento

---

(¹) En el citado caso de Quo Warranto este Tribunal aprobó la indicada escritura núm. 21.    Una de sus cláusulas, dispone:

"Molienda de Cañas de la Autoridad.—Todas las cañas que produzca la Autoridad de Tierras de Puerto Rico, en las fincas que le trasmite Rubert Hermanos, Inc., serán molidas en lo sucesivo en la Central San Vicente, incluyendo las procedentes de las fincas 'Monte Grande', 'Lizas', *'Ingenio'* y 'Lechería Pastillo', hasta tanto no se disponga otra cosa por la Comisión de Servicio Público de Puerto Rico."    (Bastardilla nuestras.)

(²) El párrafo 10 de la Sentencia por Consentimiento lee en español, como sigue:

"10—Que la Autoridad de Tierras de Puerto Rico hasta donde legalmente pueda hacerlo, asume para sí y para los futuros dueños y arrendatarios de las tierras a ser vendidas en virtud de este contrato, la obligación y el deber de moler todas las cañas de azúcar sembradas y cultivadas en dichas tierras en el molino de la Carmen Centrale, Inc., sus sucesores o cesionarios; y dicha Carmen Centrale, Inc., sus sucesores o cesionarios quedarán obligados a moler dichas cañas; entendiéndose, sin embargo, que nada de lo aquí estipulado se interpretará como que impone sobre la Autoridad de Tierras de Puerto Rico, o sobre los futuros dueños o arrendatarios de las tierras, la obligación de entregar cañas para molienda sobre una base no beneficiosa o confiscatoria.    Queda entendido además, que nada de lo aquí estipulado se interpretará como que obliga a la Autoridad de Tierras de Puerto Rico, sus sucesores o cesionarios, a sembrar cañas en las tierras que puedan ser vendidas en virtud de este contrato, o como que obliga a Carmen Centrale, Inc., sus sucesores o cesionarios, a continuar en el negocio de elaborar azúcar o mieles.    Nada de lo aquí estipulado ha de entenderse como que implica que la Autoridad de Tierras de Puerto Rico, sus sucesores o cesionarios, no puedan hacer arreglos para moler cualquier parte de las cañas sembradas en las tierras mencionadas en otra central o centrales, siempre y cuando se hagan arreglos con Carmen Centrale, Inc., en virtud de los cuales se le suministre de otras fuentes una cantidad de cañas igual para molienda por dicha Carmen Centrale, Inc., bajo circunstancias en cuanto a arrastre y a otras condiciones que no sean más onerosas para Carmen Centrale, Inc., que las que existen con respecto a las cañas trasladadas a tales otras centrales o central."

y escritura de compraventa disponían expresamente que todas sus estipulaciones estaban sujetas a las leyes y reglamentos presentes y futuros de los gobiernos de los Estados Unidos y de Puerto Rico.

Todos los derechos adquiridos por Rubert Hermanos, Inc., y Carmen Centrale, Inc., en virtud de las antes mencionadas escrituras núms. 21 y 14 fueron cedidos a Central San Vicente, Inc., la nueva corporación que se organizó después de los *quo warranto*.

Para la zafra de 1953 las fincas "Ingenio" y "San Antonio" solamente molieron en la Central San Vicente el treinta por ciento (30%) de sus cañas por razón de haberse convenido que una cantidad equivalente de cañas de dichas fincas, que no moliera Central San Vicente, le sería enviada para su molienda por otras Fincas de Beneficio Proporcional, lo cual no se hizo, y por cuya razón Central San Vicente, Inc., que tiene capacidad para moler todas las cañas de las fincas "Ingenio" y "San Antonio", se opuso al cambio de molienda.

A base de estos hechos la Junta Azucarera dictó una orden declarando sin lugar la oposición de Central San Vicente, Inc., a la transferencia de molienda. La Junta se fundó en que (1) los contratos celebrados entre la Autoridad de Tierras y Rubert Hermanos, Inc., y Carmen Centrale, Inc., están en conflicto con la actual Ley Azucarera, en lo que respecta a las cláusulas sobre molienda de cañas, y (2) dichos contratos son contrarios al interés público según éste está expresado en la referida ley.

Central San Vicente, Inc., ha solicitado de este Tribunal la revisión de la orden de la Junta. Fundamentalmente sostiene que dicha orden es errónea porque (*a*) la Ley Azucarera no le da derecho a un colono a cambiar la molienda de sus cañas de una central a otra en contravención a un contrato previamente concertado, ni cabe implicar que la Legislatura haya tenido la intención de menoscabar derechos de molienda adquiridos con anterioridad a dicha Ley; (*b*) la orden cuya revisión solicita es inconsistente con el Reglamento de la

Junta, y (c) de pretender la Ley Azucarera anular o dejar sin efecto derechos adquiridos con anterioridad a su vigencia, dicha ley sería contraria a la cláusula de contratos y a la del debido procedimiento de ley de la Constitución de Puerto Rico y de la Constitución de Estados Unidos.

██ La siembra, cultivo y molienda de cañas de azúcar es la industria primordial de Puerto Rico y de ella depende esencialmente su prosperidad y el bienestar de sus habitantes. Dada la importancia que tiene dicha industria en relación con la economía de la isla, no existe hoy controversia en cuanto al hecho de que esta industria está revestida de un gran interés público, y por ende, sujeta a reglamentación por nuestra legislatura en el ejercicio del poder de policía del Estado. *Pueblo* v. *Rubert Hnos., Inc*, 53 D.P.R. 779; *Vidal* v. *Fernández*, 104 F.2d 606; *Pueblo* v. *A. Roig, Sucrs.*, 63 D.P.R. 18. Para la fecha en que se otorgaron los contratos de compraventa con las cláusulas sobre molienda de cañas que han dado origen a la presente controversia, estaba en vigor la Ley núm. 221 de 12 de mayo de 1942 ((1) pág. 1177).([3]) Esta ley convirtió a todas las centrales azucareras en Compañías de Servicio Público y las puso bajo la jurisdicción de la Comisión de Servicio Público. Su art. 42 ordenaba a la Comisión que procediera a determinar y poner en vigor la zona de producción de toda compañía azucarera y el art. 43 disponía que toda franquicia final que la Comisión concediera a cualquier persona natural o jurídica o a cualquier compañía azucarera determinaría la zona de producción de la entidad concecionaria de tal franquicia, y prohibía a éstas elaborar o refinar azúcar usando como materia prima cañas de azúcar producidas fuera de la zona de producción que le fuere asignada. Estando pendiente de reglamentación este aspecto de zonificación, la Comisión de Servicio Público dispuso que cada central azucarera estaría limitada a moler aquellas cañas

([3]) La constitucionalidad de la Ley 221 fué sostenida en *Pueblo* v. *A. Roig, Sucrs.*, supra, confirmado en *Roig* v. *People of Puerto Rico*, 147 F.2d 87.

procedentes de los mismos terrenos que produjeron cañas de azúcar molidas por tal Central Azucarera durante la zafra de 1943 y proveyó el procedimiento para la transferencia de cañas de una central a otra en casos especiales. Más tarde se estableció el año 1949 como período básico. (⁴) Fué bajo el imperio de esta regimentación que la Autoridad de Tierras convino en moler las cañas producidas en las fincas "Ingenio" y "San Antonio" en las centrales de las cesionarias de Central San Vicente, Inc. Pero la Ley núm. 221 de 1942 fué luego derogada por la Ley núm. 426 de 13 de mayo de 1951. Esta nueva ley, hoy en vigor, mantuvo la reglamentación de la industria azucarera por el Estado aunque en forma distinta. "Bajo esta última ley ya no se consideraba a las centrales como empresas de servicio público . . . ."; (⁵) creó una agencia administrativa bajo el nombre de "Junta Azucarera" con autoridad para instrumentar la ley y hacer cumplir sus disposiciones y resolver las controversias que surgieran entre las centrales y los colonos; (⁶) se omiten las disposiciones de la Ley 221 sobre zonas de producción y en su lugar se crea la libre competencia entre las centrales para proveerse del abasto de cañas de azúcar de colonos para la elaboración de azúcar. (⁷) A este efecto la Ley núm. 426 dispone:

"Artículo 3.—Ninguna central azucarera podrá negarse a moler las cañas de un colono o sus sucesores o causahabientes, que hubiere sido colono de dicha central en cualesquiera de los tres (3) años anteriores a la fecha en que ofrezca dichas cañas para ser molidas, y la central deberá darle preferencia a éstos,

---

(⁴) Orden de Zonificación promulgada por la Comisión de Servicio Público en 12 de abril de 1944 y art. 15 del Reglamento General para las Compañías Azucareras aprobado en 24 de junio de 1946, enmendado en 14 de febrero de 1949.

(⁵) *A. Roig, Sucrs.* v. *Junta Azucarera*, 77 D.P.R. 342, 349.

(⁶) Cada Finca de Beneficio Proporcional establecida bajo las disposiciones del Título IV de la Ley de Tierra, es un "colono". Art. 2 de la Ley Azucarera de 1951.

(⁷) Para un estudio comparativo de las disposiciones de ambas leyes, la 221 de 1942 y la Ley Azucarera de 1951, véase *"Local Regulation of the Sugar Industry in Puerto Rico"*, 22 Revista Jurídica de la Universidad de Puerto Rico, pág. 385.

para moler sus cañas, sobre los nuevos colonos; *Disponiéndose,* que en aquellos casos en que un colono hubiere sido colono de dos o más centrales, la obligación de la central será moler la parte proporcional de la cosecha que dicho colono entregó a dicha central para ser molida durante el último año en que fué colono de la misma.

"Para que un colono tenga derecho a cambiar de la central donde muele sus cañas a otra central, vendrá obligado a notificar a las centrales afectadas su intención de hacer dicho cambio no más tarde del día 1 de noviembre anterior a la zafra en que intente hacer dicho cambio.

"La central vendrá obligada a moler las cañas de los nuevos colonos, a menos que la Junta exima a la central de tal obligación luego de haberse demostrado ante la Junta que la central carece de suficiente capacidad para asumir la molienda de las cañas de dichos colonos.

"Cualquier infracción a este Artículo será castigada bajo las disposiciones de los Artículos 28, 29 y 30 de esta Ley."

Las disposiciones de este artículo conceden al colono el derecho a cambiar de la central donde muele sus cañas a otra central sin más condiciones que la de notificar a las centrales afectadas su intención de hacer dicho cambio no más tarde del día 1 de noviembre anterior a la zafra en que intente hacer el cambio. Una vez cumplido el requisito de la notificación, la central viene obligada a moler las cañas del nuevo colono, excepto cuando la Junta Azucarera exima a la central del cumplimiento de tal obligación luego de haberse demostrado ante ella que dicha central carece de capacidad para asumir la molienda de las cañas del nuevo colono. Fuera de esta excepción, la central viene obligada a moler las cañas del nuevo colono. La Junta carece de facultad y autoridad para eximir a la central del cumplimiento de esa obligación legal excepto en el único caso ya apuntado de que la capacidad productiva de la central sea insuficiente.

La peticionaria sostiene, sin embargo, que la aplicación de la Ley Azucarera de 1951 a los contratos otorgados con anterioridad a la aprobación de dicho estatuto violaría la cláusula constitucional que prohibe la aprobación de leyes que

menoscaben las obligaciones contractuales. A nuestro juicio no estamos, en el presente caso, frente a esa situación. ¿Cuáles son las obligaciones contractuales que la peticionaria alega serían menoscabadas por la Ley Azucarera? Son las asumidas por la Autoridad de Tierras en virtud de las escrituras núms. 14 y 21 para moler en lo sucesivo las cañas de las fincas Ingenio y San Antonio en la Central San Vicente y en los molinos de Carmen Centrale, Inc., respectivamente. Las obligaciones así asumidas por la Autoridad de Tierras, eran obligaciones que la ley y los Reglamentos que la instrumentaban, habían impuesto ya a las partes al determinarse las zonas de producción de cada central azucarera. En ausencia de cláusulas contractuales, la situación legal, en lo que respecta al sitio donde habrían de molerse las cañas producidas en las fincas de la Autoridad de Tierras, hubiera sido la misma. En otras palabras, bajo las leyes entonces en vigor, la Autoridad de Tierras estaba impedida de obligarse a moler sus cañas fuera de la zona de producción asignada por la Comisión a cada central azucarera.. Por esta razón el pacto sobre molienda de cañas consignado en la escritura núm. 21 estaría en vigor hasta tanto se dispusiera otra cosa por la Comisión de Servicio Público. Igualmente los pactos consignados en la escritura núm. 14 se subordinaron a las leyes en vigor y a las que se aprobaren en el futuro. Esta reserva tenía validez aunque no se hubiera consignado en los contratos, pues a pesar de la cláusula constitucional invocada por la peticionaria, el Estado retiene autoridad sobre los contratos para proteger los intereses vitales de sus habitantes y la regla es que todos los contratos están subordinados a esta autoridad suprema que incluye no solamente la protección de la salud, la moral y la seguridad del pueblo sino que es igualmente extensiva a sus necesidades económicas. *Chicago & Railroad* v. *Nebraska*, 170 U.S. 57; *Veix* v. *Sixth Ward Assn.*, 310 U.S. 32 y la regla es que los contratos relacionados con un negocio reglamentado por el Estado—como lo es la industria azucarera en Puerto Rico—están sujetos al posible

ejercicio de este poder soberano. *Erie R. R. Co.* v. *Public Util. Commrs.*, 254 U.S. 394; *Rast* v. *Van Deman & Lewis*, 240 U.S. 342. La reserva de los atributos esenciales del poder soberano debe leerse en los contratos de esta naturaleza. *Home Bldg. & L. Assn.* v. *Blaisdell*, 290 U.S. 398.

Conforme a estos principios nuestra Legislatura tenía poder para cambiar aquel aspecto de la industria azucarera referente a las zonas de producción. El ejercicio de este poder no podía ser anulado por las partes contratando para el futuro—*Union Dry Goods Co.* v. *Georgia P. S. Corp.*, 248 U.S. 372; *Dillingham* v. *McLaughlin*, 264 U.S. 370; *Taylor* v. *Brown*, 137 F.2d 654; *Philadelphia Coke Co.* v. *Bowles*, 139 F.2d 349.

Y eso fué precisamente lo que hizo en la Ley Azucarera. Las anteriores *zonas de producción* fueron eliminadas y en su lugar se consagró la libre determinación del colono para escoger la central que ha de moler sus cañas. El derecho del colono a hacer tal determinación, quedó incorporado, mediante el ejercicio del poder de policía ejercitado por el Estado, a los contratos anteriores a la aprobación de dicha Ley. No podemos inferir, del contexto del estatuto, que haya sido otra la intención de la legislatura. No existe en este caso la alegada violación de la cláusula constitucional sobre contratos. Siendo ello así, y en vista de que no es errónea la resolución dictada por la Junta en este caso, es innecesario discutir otras cuestiones planteadas por las partes.

*La resolución de la Junta será confirmada.*

El Juez Asociado Sr. Sifre no intervino.